### MacRAE v. GRAHAM et al.

(Supreme Court, Appellate Division, First Department. May 7, 1897.)

PARTNERSHIP—INDIVIDUAL OR FIRM ASSETS.

A judgment debtor, who owned an equity of redemption, on which the judgment was a lien, and who, with one B. and others, was jointly engaged in several enterprises called "syndicates," entered into negotiations for a settlement of the judgment, and it was finally effected in the name of B. Shares of stock belonging to one of the syndicates were delivered to the judgment debtor as security for part of the sum to be paid under the settlement. Afterwards B. was appointed receiver of the syndicate matters, and he paid the balance due under the settlement, whereupon the judgment was assigned to him. There was no evidence that any payment was made by the judgment debtor, or by any one for him. *Held*, that the judgment belonged to the receivership, and was a valid lien on the equity of redemption, as against the representatives of the debtor, who had died.

Appeal from special term, New York county.

Action by Charles MacRae against Charles H. Graham and others to foreclose a mortgage. From an order distributing the surplus money arising on the foreclosure sale, George Hoadly and others, constituting the firm of Hoadly, Lauterbach & Johnson, appeal. Reversed.

Argued before VAN BRUNT, P. J., and WILLIAMS, PATTERSON, O'BRIEN, and INGRAHAM, JJ.

George Hoadly, for appellants.

Rush Taggart, for respondent.

PATTERSON, J.    The referee found that the surplus moneys arising from the sale of the mortgaged premises (less the value of the dower interest of the widow of the owner of the equity of redemption) belong to the executor of the will of Henry S. Ives, and the report in and by which such moneys were awarded to the executor was confirmed by the court at special term. From the order of confirmation this appeal is taken. The executor claimed the whole remaining surplus. Messrs. Hoadly, Lauterbach & Johnson claimed a part of that surplus, as assignees of a judgment against Ives and others, which was a record lien on the mortgaged premises at the time the mortgage was foreclosed. That judgment was recovered by the Miners' Savings Bank of Pittston on the 18th of March, 1893. On the 18th of November, 1893, it was assigned by the bank by an instrument in writing to Mills V. Barse. On June 21, 1895, Barse assigned it to Hoadly, Lauterbach & Johnson, and on the same day Barse, receiver of certain property and assets, and in his capacity of receiver, transferred and assigned the same judgment to the same assignees, who therefore stood before the referee as claimants under duly-executed instruments, which conferred upon them the full legal title to the judgment, which was undoubtedly on its face a valid lien on the mortgaged premises, and attached after the sale to the surplus moneys. The consideration of the transfers was valuable and ample, but the executor claims that the legal title held by Barse was subordinated or subjected to a trust in favor of Ives; that Ives in his lifetime entered into an arrangement with the bank for the satisfaction of the judgment; that that arrangement consisted of the payment of moneys on account and the deposit of securities for the balance of the judgment; that, not wishing to have the judgment actually discharged of record, Ives caused it to be assigned to Barse, to hold for Ives, and that Barse merely became the nominal owner, and hence that the transfers from Barse are subject to the alleged equities of Ives and his estate. With the legal title thus situated, the burden was on the executor to establish by satisfactory proof the alleged equities, and particularly so because Ives is dead and Barse was compelled to keep silence as to the transaction. The executor showed some general facts of Ives' peculiar way of doing business, of his habit of concealing his personal relation to his own business transactions, of his making contracts and incurring obligations in the names of third persons,—all of which matters are of no especial consequence, for this particular transaction cannot be proven by any deduction to be

drawn from Ives' habit of conducting his affairs. This much, however, is established by proof, viz. that Ives, through his attorney, Bard, did enter upon negotiations with the attorneys of the bank for a settlement of the judgment, and did agree upon the terms of that settlement. It is at this point that Barse becomes connected with the transaction. The written agreement embodying the terms of that transaction is executed by the bank on the one part and Barse on the other. All the obligations of performance of that contract with the bank are assumed and undertaken by Barse. He was to make the cash payments and furnish the securities. All that is not incompatible with his being the mere agent of Ives, but the burden is upon Ives' executor to show, not only the intention with which Barse took title, but that performance was made by or on account of Ives, and that the money and the securities required for the performance of that contract were furnished by or on account of Ives and not by or on account of Barse. Mr. Bard, the attorney for Ives, testified to declarations of Ives of his intention to take the assignment of the judgment from the bank in the name of Barse. The only evidence to connect Barse originally with that arrangement is Bard's further statement that Barse was present when the declaration was made. Counsel for Hoadly, Lauterbach & Johnson offered to show by Barse that he was not present at any time when Ives made such a declaration, but the offered testimony was excluded. Assuming that, in the form in which the questions were put to the witness, the ruling of the referee was correct, we must consider it as established that Ives caused the agreement with the bank to be made in the name of Barse, and for the purpose of controlling the judgment through the latter. But Barse nevertheless was the responsible person contracting with the bank, and the question remains as to his connection with the transaction being such as vested in him, either individually or as receiver, any right in and to the judgment which could be transferred to Hoadly, Lauterbach & Johnson. That involves the acts and dealings of the parties in the performance, and completion of the contract with the bank, and an inquiry into the sources whence were derived the moneys and securities given to the bank in performance of the contract which Barse had made and undertaken to perform.

It appears that Ives, Barse, Phillips, and others were engaged in 1893 in a number of business enterprises, which, throughout the proceedings in this matter, are called syndicates or syndicate operations. All these matters of business were conducted in the office of Phillips, who was the banker for his associates, and who directed and managed them all. He kept no bank account in the name of the syndicates, but transacted all their financial business with his own bank, and kept a personal account with Henry S. Ives. Phillips seems to have acted in settling the monetary details of the transaction resulting in the assignment of the bank's judgment to Barse. He paid to the bank's attorneys their fees and costs, and in November, 1893, also paid to the Miners' Bank, at the request of Ives, by his check, the sum of $2,430.36, and charged that sum to Ives' personal account. There was also delivered to the bank certain shares of stock, as collateral security for the balance agreed to be paid for the assignment

of the judgment.    Those shares belonged, not to Ives, but to a syndicate of which he was a member, and in which Barse was also interested.    Phillips' personal relation to the transaction ceased with the payments he made, and above referred to.    On the 30th of August, 1894, Barse was appointed by the United States circuit court a receiver of syndicate or partnership matters in which Ives, Barse, and one Morehead were interested.    The securities that had been left with the bank as collateral security, as above stated, were sold by the bank and applied on the agreement with Barse.    From that sale was realized a certain sum, and in October, 1894, Barse paid to the bank a balance of $3,521.56 on that agreement, and on his books as receiver charged that final payment against Henry S. Ives.    There is no evidence in the whole record that Ives or any one on his behalf ever paid this final balance to the receiver, nor is there any evidence that the syndicate's stocks that were used in the transaction under the Barse agreement with the bank were borrowed by Ives from the syndicate, or that he accounted in any way to the syndicate for those securities.    I think the evidence shows that the securities used in the transaction with the bank on the settlement of the judgment would have belonged to the syndicate and thus to the receivership.    The referee has found that they did not, and therein he fell into an error.    Mr. Phillips certainly knew to whom those securities belonged.    He was asked the question, "Who were the members of the syndicates to whom the securities belonged which were deposited with the Miners' Bank of Pittston?" and he said that they consisted of Mr. Ives, Mr. Barse, himself, and other persons interested in one or more syndicates.    Mr. Morehead and Mr. Graham were interested in it.    And this question was then asked him: "Mr. Barse is now the receiver of those syndicates?    A. Yes."    It also appears from the testimony of Mr. Phillips that the item of $2,430.36 was settled through the adjustment of the receiver's account, and that that item was never repaid to Phillips during Ives' lifetime.    It would seem from the whole testimony in the case that all the matters connected with the adjustment of the Barse contract with the Miners' Bank were drawn into the receivership, and it was assumed during the hearings before the referee that accountability for the securities used in the transaction with the bank was directly to the Barse receivership.    That being so, the consideration for the transfer of the judgment was really paid either in whole or in large part from the resources of the syndicate, and the claim arising therefrom belonged to the receivership, and the assignment of the judgment of the bank was an asset of the receivership.    Barse's relation to the judgment then stood thus:    He had the legal title individually to the judgment.    As receiver he had a claim upon that assignment, either for the whole amount of the consideration paid the bank, or for that amount less Phillips' payment on account of Ives.    His right individually, and his right as receiver, to the judgment, were transferred to Hoadly, Lauterbach & Johnson, and they would be entitled to enforce the claims thus transferred to them against the surplus money, to the extent that Barse in either capacity was entitled to claim against Ives, even upon the basis that

in the original transaction he was taking a title at Ives' procurement and for Ives' ultimate benefit.

‚ On all the facts of the case, I think the referee's conclusions were wrong, and that the order confirming his report should be reversed. We should not on this record make a final disposition of the moneys, but a new hearing should be had before another referee. All concur.